## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| Powis Forjoe,<br><br>                                    *Plaintiff,*<br><br>        v.<br><br>Simplify Asset Management, Inc.,<br><br>                                    *Defendant.* | **COMPLAINT**<br><br>CIVIL ACTION NO. _____<br><br>**JURY TRIAL DEMANDED** |

### PRELIMINARY STATEMENT

1.      Buyer's remorse is *not* a defense to breach of contract, not even for a powerhouse financial institution like Simplify Asset Management, Inc.

2.      In fact, the whole purpose of contractual agreements is to bind parties to agreed-upon obligations so that one party cannot turn around and whimsically decide to do something else at the other party's expense.

3.      And where a party attempts to do what it thinks is clever by manufacturing false reasons to justify its capricious unlawful pivot, contract law sees right through that conduct and says, "not in my house."

4.      Simplify Asset Management, Inc. ("Defendant" or "Simplify") seems to have buyer's remorse.  Simplify entered into a ***three-year guaranteed contract*** with Plaintiff Powis Forjoe, hiring him as a Managing Director and Portfolio

1

Manager for Quantitative Investment Strategies ("QIS Investments")—a relatively new business venture for Simplify designed to win institutional mandates.[1]

5.      So big was Simplify's aspiration to dive into this venture that it hunted for a seasoned team of established institutional investment professionals and then poached the lot of them.  Indeed, when Simplify brought in Mr. Forjoe, it poached a select group of individuals from United Parcel Service (UPS) Group Trust and gave them guaranteed contracts too.  Simplify gave Roxton McNeal, Mr. Forjoe's former boss at UPS, a three-year guaranteed contract to lead this new team handling QIS Investments.  Simplify hired the third person on the team, Seonyong ("Sam") Park, as a Vice President and Portfolio Manager for QIS Investments.  Mr. Park's initial employment contract was guaranteed for a one-year period, with an optional renewal for the next two years.  Mr. Park was the most junior person on the team.  With these guaranteed contracts came guaranteed bonuses and voila, Simplify got itself a dream team.

6.      Given the duration of Mr. Forjoe's and Mr. McNeal's guaranteed contractual terms, Simplify understood that winning institutional mandates could not happen overnight.  Rather, to be done correctly and secure consistent positive

---

[1] An "institutional mandate" is a formal agreement where an institutional investor—such as a pension fund or sovereign wealth fund—hires investment professionals to manage capital to meet the investor's specific investment objectives (*e.g.*, steady growth of the capital over a three-year period or maintain the capital at a comparable amount and invest in low-risk propositions).

returns in the long run, Simplify understood that the QIS Investments team needed to implement a meticulous, comprehensive, and exemplary approach.  Naturally, this would take time; Rome was not built in a day.

7.      But Simplify did not have the patience to build Rome.  Less than a year into exploring this business venture, Simplify abruptly decided to abandon this path and toss the dream team overboard.  Instead of giving Mr. Forjoe the three years necessary to create from scratch new systems required to produce results, eleven months in, absent "Cause," it iced him.  What Mr. Forjoe was tasked with doing for Simplify, which he was *actually* doing, is almost too mathematically complex and quantitatively sophisticated to describe.  What Simplify did was simple—360 days after entering a three-year contract, it wrongfully terminated him and breached its contract.  At the time of this decision, Simplify had not meaningfully given the QIS Investments team the time it needed to get this venture off the ground.  Simplify terminated Mr. McNeal on April 28, 2025, and thereafter, terminated Mr. Forjoe on August 1, 2025.  Each of these seasoned, established professionals had pristine work histories sparkling with recognitions, praise, promotions, and extraordinary production that outpaced their escalating responsibilities.  In their combined three decades plus of working in this highly technical field, neither had ever been terminated, or even received a whisper of reproach.

8.     To be clear, Simplify certainly had the option of changing its mind vis-à-vis the QIS Investments team or devoting the time necessary to obtain the institutional mandates it initially sought.  Everyone is allowed to change their mind or the direction of their business.  All Simplify had to do was fulfill the obligations laid out in the contract Simplify itself drafted, *i.e.*, pay Mr. Forjoe what Simplify promised him for the entirety of the three-year guaranteed term.  The parties then could have gone their separate ways.  But Simplify instead breached its contract and then manufactured a bogus reason for doing so.

9.     Because Mr. Forjoe's contract ***only*** permitted termination "for Cause," Simplify concocted an eleventh-hour half-baked excuse to try and justify its termination decision.  Simplify's stated rationale—that Mr. Forjoe did not perform to the standard expected—does not hold water.  Instead, the facts demonstrate that Simplify set Mr. Forjoe up to fail by setting unreasonable and unrealistic expectations on Mr. Forjoe, withdrawing critical resources necessary for Mr. Forjoe to perform his newly assigned tasks, and offering Mr. Forjoe limited guidance and direction when its plan to sabotage him started working. Metaphorically, Simplify entered into a three-year guaranteed contract with a star football quarterback.  And then a few months later, when it wanted to get out of the contract, it gave the quarterback *one week* to become a hall of fame *baseball* slugger (a notoriously challenging task, even for professional baseball players),

then fired the quarterback for "cause" for failing to do so.  Simplify's stated rationale for wrongfully terminating Mr. Forjoe was "poor performance" in a task he had no experience doing, and which he was not hired to do at all.

10.    Tellingly, Simplify's stated rationale for terminating Mr. Forjoe was also contrary to the feedback Mr. Forjoe received during his tenure at Simplify (until the last month when it was clearly trying to push him out).  Prior to July 2025, just like the prior twelve years of his career, Mr. Forjoe had received glowing feedback and praise for the work he had done at Simplify.

11.    As soon as Simplify started to plant unsubstantiated seeds of discontentment in late June 2025, Mr. Forjoe smelled the set up from miles away. He nonetheless continued to work diligently and attentively, explaining his thought processes and the complexity of the tasks he faced to his supervisors.  Mr. Forjoe routinely expressed his continued commitment to perform his job at the highest level.

12.    Simplify, meanwhile, was busy trying to dress up its half-baked excuses as "Cause."  However, nothing it manufactured came close to the high bar for "Cause" delineated in Mr. Forjoe's employment contract: "'Cause' means . . . [Mr. Forjoe's] *repeated and willful failure to substantially perform [his] duties* . . . ." (emphasis added).  A couple of amorphous declarations of unsatisfactory performance within the span of a month simply does not cut it.

13.    This is an open and shut case for breach of contract.  Simplify clearly violated the terms of its employment agreement with Mr. Forjoe by terminating him *without* Cause.  Simplify also breached its contract with Mr. Forjoe by failing to pay him the guaranteed bonus provided therein.  Accordingly, Simplify is liable to Mr. Forjoe for compensatory damages.

14.    In addition, Simplify is also liable to Mr. Forjoe for the tort of wrongful termination, borne out of its unjustified and improper termination of Mr. Forjoe in violation of the terms of his three-year guaranteed contract.  And Simplify is liable for both compensatory and punitive damages for this tort because Simplify acted with the specific purpose of harming Mr. Forjoe.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds $75,000 and is between citizens of different States.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims herein took place within this judicial district.

## PARTIES

17.    Plaintiff Powis Forjoe is a United States and Georgia citizen.  He is a resident of Fulton County, Atlanta in the State of Georgia.

18.    Defendant Simplify Asset Management, Inc., is incorporated in the State of Delaware, and its principal place of business is located in Las Vegas, Nevada.  Simplify is an investment firm that focuses on improving portfolio risk-adjusted returns through the use of alternative strategies.

## FACTUAL BACKGROUND

**Mr. Forjoe's Qualifications and Professional History**

19.    Powis Forjoe is an incredibly impressive senior investment professional with extensive experience managing hedge fund portfolios.  He has a proven track record of delivering superior risk-adjusted returns, restructuring complex portfolios, and underwriting diverse hedge fund strategies.  Mr. Forjoe's spectacular educational background and stellar professional experience prove that he is a winner—a financial maven that has served his clients with unmatched strategic advice while making his employers millions of dollars in the process.

20.    Mr. Forjoe's impressive career tracks back all the way to May 2009, when he graduated *Cum Laude* from Franklin & Marshall College with a Bachelor of Arts, Mathematics, and Economics.  In May 2012, Mr. Forjoe obtained his

Masters in Science in Quantitative & Computational Finance at Georgia Institute of Technology, a program ranked number eight in the nation.

21.    Mr. Forjoe went on to amass the following formidable professional certifications: Chartered Financial Analyst ("CFA") (September 2017); Final Risk Manager ("FRM") (April 2021); Certificate in Investment Performance Measurement ("CIPM") (May 2022); and Chartered Alternative Investment Analyst ("CAIA") (May 2023).

22.    The trajectory of Mr. Forjoe's career has always been trending in one direction—sharply up.  Shortly after graduating with his master's degree, Mr. Forjoe was snatched up by Axioma, Inc. ("Axioma"), where he worked as an Analytics Associate.  Axioma is now part of SimCorp, one of the largest global investment companies in the world.  He worked for Axioma for approximately six-and-a-half years between November 2012 and May 2019 with a perfect record of stellar performance reviews.

23.    In May 2019, Mr. Forjoe accepted a position at United Parcel Service ("UPS") Group Trust, where he joined as a Senior Investment Analyst.  His starting salary was $90,000, with an annual bonus of $15,300.  Within two years, he was promoted to Portfolio Manager.  Over the course of his five-year tenure at UPS, Mr. Forjoe's salary ballooned to $267,804, with an annual bonus of $53,560.  The pace of Mr. Forjoe's salary increase was remarkable, demonstrating the

immense value he brought to UPS.  Mr. Forjoe's compensation package also included a 401(k) savings plan to which UPS contributed $24,102.36.

24.    As Portfolio Manager, Mr. Forjoe managed a $3 billion liquid alternatives[2] portfolio of hedge funds and portable alpha strategies, among other impressive and mammoth responsibilities.

At UPS, Mr. Forjoe worked in a team under the leadership of Mr. McNeal from 2019–2021, before he was promoted and given more responsibility on the Public Markets team.  Mr. Park, who joined UPS in 2023, also worked under the leadership of Mr. McNeal.  Together, Mr. McNeal, Mr. Forjoe, and Mr. Park, through their collective experience, were a match-fit, formidable team.  Their collective experience delivering undeniable results at one of the largest companies in the world made it an easy choice for Simplify in deciding to poach them as a unit.

---

[2] "Liquid alternative investments are mutual funds or exchange-traded funds (ETFs) that aim to provide investors with diversification and downside protection through exposure to alternative investment strategies.  These products' selling point is that they are liquid, meaning that they can be bought and sold daily, unlike traditional alternatives, which offer monthly or quarterly liquidity.  They come with lower minimum investments than the typical hedge fund, and investors don't have to pass net-worth or income requirements to invest."  James Chen, *Liquid Alternatives: Definition, Purposes, Risks, and Examples* (Sept. 22, 2022), available at: https://www.investopedia.com/terms/l/liquid-alternatives.asp

**Simplify Poaches Mr. Forjoe from UPS**

25.     In the summer of 2024, UPS adopted an Outsourced Chief Investment Officer ("OCIO") model,[3] where it hired Goldman Sachs Asset Management ("Goldman") to manage its North American pension funds.  UPS employees were left with a choice—either join Goldman or resign.

26.     As UPS was making this transition and Mr. Forjoe was deciding whether to join Goldman, Mr. McNeal informed Mr. Forjoe of a new opportunity to join Simplify.  Mr. Forjoe's interest in joining Simplify depended on the compensation package offer.  Because Goldman was essentially continuing the UPS compensation package, Mr. Forjoe informed Mr. McNeal that he would only pivot to Simplify if its offer included a significant increase in Mr. Forjoe's current base and bonus pay.  This was eminently sensible given the upward trajectory of Mr. Forjoe's career.  His excellence, highly technical skills, and deep experience warranted a sizeable increase in compensation.

27.     Armed with Mr. Forjoe's position, Mr. McNeal, through his attorney, entered into negotiations with Simplify to bring the UPS team—Mr. McNeal, Mr.

---

[3] Outsourced Chief Investment Officer refers to the full or partial outsourcing of an organization's investment function to a third party, such as an asset management firm or investment consultant.  In delegating investment tasks to a third party, the organization typically retains some level of fiduciary responsibility—often times, maintaining control over the strategic asset allocation—while other fiduciary duties are transferred to the outsourced CIO provider.

Forjoe, and Mr. Park—on board.  Mr. Forjoe was not involved in these negotiations and was not privy to various negotiating positions taken or promises made prior to contractual terms being agreed upon.  As the team's leader, Mr. McNeal was the UPS team's mouthpiece and advocate.  After Simplify decided to bring the UPS team on board, Mr. Forjoe requested a meeting with the Chief-Executive Officer ("CEO"), Paul Kim, and the Chief-Information Officer ("CIO"), David Berns.  Mr. Forjoe separately met with both Mr. Kim and Mr. Berns.  During his meeting with Mr. Kim, Mr. Forjoe negotiated a $50,000 increase in his starting salary.  The Simplify team obliged because after having the opportunity to personally assess the star they poached, they realized he was worth the extra money.

28.    Simplify ultimately offered acceptable contractual terms for each member of the UPS team, reflected in separate contracts for each individual.  Simplify drafted the contract, including the definitions of the terms it went on to flagrantly breach.  Mr. Forjoe, for his part, reviewed, understood, and voluntarily signed his contract.

**The Relevant Terms of Mr. Forjoe's Contract**

29.    Mr. Forjoe's employment with Simplify "commence[d] on or around 8/6/2024" and his employment was:

> guaranteed from the Start Date through the third (3rd) anniversary of the Start Date (such term, the "Guaranteed

11

Term") unless the Company[4] has Cause (as defined below) to terminate your employment during the Guaranteed Term. Immediately following the conclusion of the Guaranteed Term, you shall automatically become an at-will employee of the Company, at which time your employment by the Company shall not be guaranteed for any period of time. In the event the Company terminates your employment without Cause following the conclusion of the Guaranteed Term, the Company shall pay you an amount equal to one (1) year of your then in effect annualized base salary and bonus within thirty (30) days of your final day of employment by the Company.

30. Mr. Forjoe's contract defined "Cause" as follows:

(i) your repeated and willful failure to substantially perform your duties set forth in this Letter Agreement or any other duties or responsibilities agreed to in writing by you and the Company; (ii) your material breach of this Letter Agreement or any other written agreement between you and the Company; (iii) your dishonesty, fraud, or willful misconduct related to the Company or in connection with your employment by the Company; (iv) your conduct bringing the Company into substantial public disgrace or disrepute; or (v) your commission of any felony crime or fraud or violation of any securities laws, rules, or regulations; provided, however, prior to terminating your employment for Cause, the Company first must provide written notice to you within ten (10) days after the date on which the Company asserts an event constituting Cause has occurred, and then allow you thirty (30) days thereafter during which you may attempt to cure the matter giving rise to Cause unless such matter is not curable.

---

[4] In Mr. Forjoe's employment contract, "Company" refers to Simplify.

12

31.     Mr. Forjoe's title at Simplify was "Managing Director and Portfolio Manager of QIS Investments."  Even though Simplify was going "all in" on this relatively new initiative, (whereas before it had only dipped its toes in the water), Simplify drafted Mr. Forjoe's contract to state that he had the authority and responsibility that is "customarily attendant to such position, subject to such direction and limitation as may be specified by individual(s) as determined by [Simplify] in its sole discretion."  In other words, Simplify bestowed on Mr. Forjoe the same authority and responsibility exercised by an imaginary archetype of an individual Simplify itself was unfamiliar with.  In addition to being absent from his employment agreement, at no point during Mr. Forjoe's tenure at Simplify did anyone explain what "customarily attendant to such position" means.

32.     As a Managing Director and Portfolio Manager of QIS Investments, Mr. Forjoe's compensation package was as follows:

a. "**<u>Base Salary</u>**.  Commencing as of the Start Date, you will receive a base salary from the Company at the annualized rate of $350,000 (the "Base Salary"), payable in accordance with the regular payroll practices of the Company.  Your Base Salary may be subject to increases by the Company from time to time."

b. "**Bonuses.**

*Sign-on Bonus*.  The Company will pay you a one-time sign-on bonus of $50,000, payable upon execution of this Agreement.

*Annual Bonus*.  With respect to each calendar year you are employed by the Company, including following the Guaranteed Term, the Company will pay you an annual bonus in an amount equal to the greater of (i) $150,000, and (ii) a percentage of the 20% of the Revenue Share (as defined below) (such bonus, the "Annual Bonus") to be determined by the Managing Director and Head Portfolio Manager of QIS Investments; provided, however, with respect to calendar year 2024 only, your Annual Bonus shall be pro-rated based on the portion of the calendar year you are employed by the Company (*i.e.*, as measured from the Start Date through December 31, 2024). "Revenue Share" is the Net Revenue actually received by the Company or its affiliates during each calendar year from the pool of QIS and QIS SMA Hedge Fund Mandates.  The Annual Bonus shall be paid to you within forty-five (45) days following the end of each calendar year."

c. "**Withholdings.**  All payments made pursuant to this Letter Agreement will be subject to applicable withholdings for federal, state and local taxes."

d. "**Benefits.**  You will be eligible to participate in any benefit plans or programs of the Company as may exist from time to time, including group health coverage, the Company's 401k plan and the Simplify Option Plan, subject in all cases to the terms of such plans and programs, which may be amended from time to time by the Company."

33.    The employment contract then went on to make clear that the terms therein constituted the "[e]ntire agreement," and "[n]o provision of th[e] Letter Agreement [could] be amended, modified, waived, or discharged except as agreed to in writing by the parties."

34.    Under the compensation terms of the contract, Mr. Forjoe was contractually entitled to the following amount over the course of three years, at minimum:

a. Base salary: $350,000 (annual salary) x 3 (Guaranteed Term) = $1,050,000.

b. Sign-on bonus: $50,000.

c. Annual bonus: Either $150,000 x 3 (Guaranteed Term) = $450,000,[5] or 20% of the company's revenue share, as described in Paragraph 31(b), whichever is higher.

d. The value of the ancillary benefits (unknown amount).

e. Total: **$1,550,000**.[6]

35.    In addition, Mr. Forjoe's contract also provides for additional pay at the same contracted rate ($350,000 base + at least $150,000 bonus) for another year *after* the Guaranteed Term if he is terminated without Cause.[7]  Because Simplify terminated Mr. Forjoe without Cause, it owes Mr. Forjoe another $350,000 in base pay and $150,000 as an annual bonus.  In total, Simplify owes Mr. Forjoe **$2,050,000** ($1,550,000 + $500,000).

---

[5] The bonus should have been paid out as follows: $60,410 (pro-rated bonus for 2024), $150,000 (2025), $150,000 (2026), and $89,590 (pro-rated bonus for 2027).

[6] To calculate the total amount owed, we assumed that Mr. Forjoe would receive at least $150,000 as his annual bonus amount for the Guaranteed Term.  Documents obtained in discovery may demonstrate that the revenue share amount would have been larger, and thus Mr. Forjoe would have been entitled to that larger bonus amount.  This total amount also excludes the value of the ancillary benefits, the amount of which is presently unknown.

[7] "In the event the Company terminates your employment without Cause following the conclusion of the Guaranteed Term, the Company shall pay you an amount equal to one (1) year of your then in effect annualized base salary and bonus within thirty (30) days of your final day of employment by the Company."  This term can be read to mean that Simplify would only owe this money if it terminated Mr. Forjoe absent Cause after the first three years; the term's ambiguity must be construed against Simplify as the drafter of the Contract.

36.     Upon information and belief, the structure of Mr. Forjoe's contract was similar to that of his team leader, Roxton McNeal.  Mr. McNeal's contract also provided for a three-year Guaranteed Term and was only terminable for "Cause." Mr. McNeal was employed as a Managing Director and Head Portfolio Manager of QIS Investments, with an annual base salary of $700,000, and guaranteed bonuses structured in a similar fashion to Mr. Forjoe's contract, albeit with different bonus amounts.

37.     Upon information and belief, Mr. Park's contract was structured differently.  Mr. Park's contract had a one-year Guaranteed Term, with a two-year recurring option to renew at the end of the year.  His contract also provided for a guaranteed pro-rated bonus for his first year, which would be calculated out of the full $75,000 bonus amount.

**The Amount Mr. Forjoe is Owed Under the Terms of the Contract**

38.     As elaborated above, the minimum compensation value owed to Mr. Forjoe under the terms of his employment agreement is **$2,050,000**.  During Mr. Forjoe's tenure at Simplify, he received the following payments:

   a. Base salary: $342,045.38.

   b. Sign-on bonus: $50,000.

   c. Separate company-wide discretionary bonus: $6,000.

   d. Total: **$398,045.38**.

39.     Therefore, under the compensation terms of Mr. Forjoe's Simplify contract, and due its decision to terminate Mr. Forjoe without Cause, Simplify owes Mr. Forjoe **$1,651,954.62**.[8]

## Mr. Forjoe's First Six Months at Simplify and Simplify's Early QIS Replication Efforts

40.     During Mr. Forjoe's tenure at Simplify, Mr. Forjoe, Mr. McNeal, and Mr. Park operated akin to a satellite office, with a dedicated workspace in Alpharetta used by them exclusively.

41.     The former UPS team worked under the leadership of Mr. McNeal and started implementing their processes and expertise towards winning Simplify institutional mandates—a process which takes years, not months.  Indeed, upon information and belief, Simplify's goal in hiring Mr. McNeal and the UPS team was to utilize their expertise and experience to secure institutional investors as long-term clients of Simplify.  To that end, during Mr. Forjoe's first six months at Simplify, he built models within his wheelhouse targeted at this goal, *i.e.*, models

---

[8] Under Georgia law, "[w]here by a breach of contract a party is injured, he is bound to lessen the damages as far as is practicable by the use of ordinary care and diligence."  O.C.G.A. § 13-6-5.  Mr. Forjoe secured new employment at the Teacher's Retirement System of the State of Illinois ("TRSIL"), which commenced on September 16, 2025.  His annual base salary is $228,000, and this new position does not include bonuses.  Mr. Forjoe's new employment is "at-will."  Assuming Mr. Forjoe continues to work at TRSIL, the maximum amount that his contractual damages can be mitigated by is **$427,500**, which is Mr. Forjoe's compensation for one year and ten-and-a-half months.

used for asset allocation, performance monitoring, and due diligence.  He received excellent feedback for the work he performed and continued to contribute to Simplify's success and growth during that time.

42. Significantly, prior to joining Simplify, neither Mr. McNeal, Mr. Park, nor Mr. Forjoe had any experience replicating QIS.  Simplify was aware of this fact.  As to Mr. Forjoe, his resume, LinkedIn, and all materials related to his experience clearly demonstrated this.  Simplify did not hire this team to perform this task, therefore it is not surprising that no member of the team performed any direct replication work within Mr. Forjoe's first six months at Simplify.

43. Replicating QIS refers to the process of copying or mimicking systematic, rules-based investment strategies.  In other words, it is the process of mimicking investment strategies based on a predetermined and objective criteria— getting from point A to point B, while applying and following specific rules and formulas, and using specific data sources available to produce specific outcomes. Investment institutions package these strategies into financial products like swaps or structured notes, allowing a wider range of institutional investors to access them.

44. The skillset necessary to replicate QIS is very specific.  In fact, there are specific institutional entities that dedicate their time solely to performing this work.  Prior to Mr. Forjoe joining Simplify, Mr. McNeal directed Simplify to

19

engage some of these entities to perform this work.  Simplify obliged.  After all, the replication work was a corollary to the work Mr. McNeal (and later, the UPS team as a whole) performed.  And this is exactly how it worked at UPS as well— Mr. McNeal's team relied on an external manager (NISA Investment Advisors) to replicate financial products.

45.     In early August 2024, just before Mr. Forjoe's start date, Simplify engaged Volos—a Boston-based fintech company that specializes in systematic strategy development and QIS analytics.  Volos was engaged between August and September 2024, and they made partial progress on replicating two strategies,[9] but never completed a full replication.  Volos cited data source issues, among other complications, for their inability to complete a full replication.

46.     Thereafter, Simplify engaged Qraft—a South Korea-based company—to replicate the same two strategies that Volos did not complete.  Qraft came up against data issues that they reported made it difficult for them to complete a full replication.  Simplify engaged Qraft's services between September 2024 and November 2024.

---

[9] The two strategies that Volos attempted to replicate were: (1) BNP VOLA—a long defensive volatility strategy from BNP; and SG Down Var—a downside variance strategy from Société Générale.

47.     Simplify ultimately terminated Qraft's services and hired Siddarth (Sid) Sethi on October 26, 2024, as Head of QIS Structuring.  Mr. Sethi's mandate was to lead Simplify's QIS replication efforts.

48.     Volos' and Qraft's failure to complete a full replication demonstrates the sheer difficulty of the task.  Even the specialists that dedicate **all** of their time to doing this work could not quite get it done.

49.     After joining Simplify, Mr. Sethi requested that Simplify procure specific data sources—data sources that likely prevented Qraft from completing a full replication.  By January 2025, Simplify acquired the requested data sources (OptionMetrics and Refinitiv).  However, even with those data sources, Mr. Sethi did not oversee the completion of a full QIS replication during Mr. Forjoe's tenure. This is further evidence of the many obstacles, variables, and complexities involved in completing a replication.  This context is all the more important when Simplify absurdly tasked Mr. Forjoe—whom everyone understood was neither a replication expert nor even someone with any experience in replication—with completing a replication project in less than a week in the final months of his time at Simplify.  *See* Infra ¶¶ 64–80.

**Simplify's First Breach of Contract**

50.     By February 2025—a little over six months after hiring Mr. Forjoe— Simplify had already breached its contract with Mr. Forjoe.  Mr. Forjoe's contract

explicitly provided for payment of his pro-rated bonus for the calendar year 2024 "within forty-five (45) days following the end of each calendar year." Accordingly, Mr. Forjoe's bonus was due on February 15, 2025. The contract did not provide flexibility or discretion with respect to the timeline of the bonus payout.

51.   Nonetheless, come February 16, 2025, Mr. Forjoe's bank account was light the $60,410 Simplify owed him.[10]  In early 2025, the CEO of Simplify, Paul Kim, announced on a company call that bonuses would be distributed in March or April of 2025.  In other words, Mr. Kim previewed Simplify's contractual breach.

52.   Despite this red flag, Mr. Forjoe patiently waited and did not address this delay with Simplify's executives, even if he had every legal right to do so.  In or around February or March 2025, Mr. Kim indicated that the timeline for distribution of bonuses had shifted to June 2025, almost five months after they were contractually due.  And, of course, come June 2025, Mr. Kim informed the staff that bonus distribution was targeted for August 2025.  Mr. Forjoe never

---

[10] If 20% of the company's revenue share yielded an amount greater than $60,410, Mr. Forjoe would have been due that amount under the contract.  That information will be revealed during discovery.

received his bonus prior to his discharge on August 1, 2025. It is beyond dispute that this is a clear, indefensible, and unequivocal breach of contract.

53. It gets worse. The facts demonstrate that Simplify never intended to pay Mr. Forjoe his bonus to begin with. In April 2025, the Chief Financial Officer ("CFO"), John Ryu, sent proposed amended contracts for Mr. Forjoe, Mr. Park, and Mr. McNeal directly to Mr. McNeal (the team leader). The *only* modification made to the existing contracts was the ***removal of the bonus clause***.

54. Using Mr. Park's amendment as an example,[11] the contract provided as follows, in relevant part: "**The words '. . . the greater of (i) \$75,000, and (ii) . . .' are struck from the 'Annual Bonus' provision on Page 2 of the Letter Agreement.**" (emphasis in original). No one reached out to Mr. Forjoe directly about these changes; instead, Simplify was orchestrating this underhanded ploy behind his back to try and bully him into accepting these new unfavorable terms. In other words, Simplify tried to pull a significant contract modification without any consideration.

55. Meanwhile, as Simplify was also trying to pull the "bonus" rug out from under Mr. Forjoe, Mr. Kim, Simplify's CEO, was telling Simplify employees

---

[11] Mr. Forjoe does not have the copy of the draft amendment to his contract. However, in addition to reviewing the draft amendment to his contract, Mr. Forjoe reviewed Mr. Park's amended contract and attests that the modifications in his own proposed amended contract are similar in sum and substance.

(including Mr. Forjoe) that bonus distribution was being delayed through the end of the summer.  It does not require a Masters in Quants from the Georgia Institute of Technology to conclude that these alleged delays were code for "the bonuses are never coming."  It is no wonder Simplify tried to amend Mr. Forjoe's contract—it sought legal cover after the fact for its clear violation of its contractual obligations.

56.     Simplify's scheme worked with respect to at least one employee that Mr. Forjoe is aware of—his former teammate, Mr. Park.  Despite being contractually owed a pro-rated bonus for the calendar year 2024, upon information and belief, Simplify attempted to alter the terms of Mr. Park's contract prior to July 2025 to eliminate the bonus he was owed and change his contract type from "guaranteed" to "at-will."  The new contract Mr. Park was provided explicitly stated that its terms would supersede any prior agreements.  Again, without bargained-for consideration.

57.     Mr. Park contacted Mr. Ryu, the CFO, to inquire whether signing the terms of the new contract would result in his forfeiting his guaranteed bonus (which was estimated to be about $30,000).  Upon information and belief, Mr. Ryu informed Mr. Park that he would not be getting a 2024 bonus and told Mr. Park that he would need to speak with Mr. Kim, the CEO, if he (Mr. Park) wanted to address this further.

58.     On June 27, 2025, Mr. Ryu reached out to Mr. Park to inquire whether Mr. Park intended to sign the "at-will" contractual agreement.  Mr. Park said he would wait until the term of his guaranteed contract expired—later in July.  Mr. Ryu then asked Mr. Park whether he would sign the contract if he was promised a $30,000 bonus—effectively leveraging what Mr. Park was already owed in an effort to hoodwink him into entering a contract with far worse terms.  Unfortunately, Mr. Park consented.  Ten days later, Simplify initiated the $30,000 bonus payment, and now Mr. Park is an "at-will" employee at Simplify with no guaranteed bonus prospects.

59.     Simplify's conduct toward Mr. Park is proof of two things: (1) Simplify had no intention of paying bonuses to the UPS team, including Mr. Forjoe.  From inception, Simplify had every intention of violating the contractual terms it drafted and agreed to; and (2) Simplify did not have the best interests of its employees at heart.  Rather, Simplify was hellbent on protecting its bottom line at the expense of its employees, regardless of the contractual commitments it made.

**Simplify Initiates Its Plan to Abandon the Former UPS Team**

60.     On April 28, 2025, Simplify terminated Mr. McNeal, allegedly for "Cause."  It bears repeating that earlier in the same month, Simplify was conspiring to alter Mr. McNeal's contract (as well as Mr. Forjoe's) to forfeit the

25

guaranteed bonus in their signed employment agreements.  The timing of Mr. McNeal's termination is suspicious, to say the least.

61.    Vis-à-vis Mr. Forjoe, it is important to understand that Simplify hired Mr. McNeal as a Managing Director and Head Portfolio Manager for QIS Investments.  Thus, his termination left a critical void and would have made it difficult for Simplify to land the institutional mandates it sought.  Put another way, Simplify's termination of Mr. McNeal not only disrupted its own aspirations to land institutional mandates but also sabotaged Mr. Forjoe.

62.    After Mr. McNeal's termination, David Berns, the CIO, reached out to Mr. Park and Mr. Forjoe to reassure them (misleadingly) that their positions were secure at Simplify and that they should continue their work.

63.    On June 18, 2025, Mr. Berns reassigned the remaining QIS team (Mr. Forjoe and Mr. Park) to a new project: replicating investment strategies using the infrastructure Mr. Sethi (new Head of QIS Structuring) had built.  As explained above, replicating strategies is an incredibly difficult task.  Therefore, it is ludicrous that Simplify gave Mr. Forjoe a *one-week* deadline to complete this task. Indeed, this irrationality is compounded by the fact that Simplify was aware that Mr. Forjoe did not have *any* replication experience and knew the outside experts it previously hired *failed* to complete a full replication despite years of experience and months of attempts.

64. Here's another apt metaphor: Mr. Forjoe was in the shoes of an orthopedic surgeon being asked to perform brain surgery. Each of these surgical specialties requires education, talent, and *years* of training and experience; but neither specialist is remotely qualified to do the other's job. In the same way all doctors go to medical school, Mr. Forjoe had the requisite baseline knowledge (obtained in graduate school) to complete the replication task, *if* provided with enough time, years of training, and expert guidance. However, asking Mr. Forjoe to complete a full replication within one week is the zenith of absurdity, especially when one considers that replication specialists, who had years of specialized training and months to perform the task, were ultimately unsuccessful. No one would ask an orthopedic surgeon to successfully perform brain surgery in one week. But Simplify did.

65. So, why would Simplify do this? There is only one logical reason. Simplify made the decision to abandon the QIS Investments team and its three-year investment into this relatively new venture. It knew that such a decision came at a high cost because of the financial commitments it made. So, what did Simplify do? It set a (transparent) trap for Mr. Forjoe.

66. On June 24, 2025, Mr. Forjoe relayed his concerns about the unrealistic timeline to Mr. Sethi. Mr. Sethi advised Mr. Forjoe not to raise his concerns with Mr. Berns; rather, Mr. Sethi, a representative of Simplify and Mr.

27

Forjoe's direct superior, recommended that Mr. Forjoe just do his best.  Mr. Park had similar timeline concerns but was also hesitant to escalate the issue with Mr. Berns.  Importantly, this was the same time when Mr. Park was concurrently discussing the terms of his contract with Simplify's CFO.

67.    On June 27, 2025, Mr. Forjoe presented his progress replicating the BAEISMLU Index to Mr. Berns and Mr. Sethi, explaining some of the challenges he faced.  Mr. Berns acknowledged the difficulties and inquired about timelines for the replication.  Mr. Forjoe estimated that it would take one to two weeks to complete the delta hedging[12] portion of the project.  Mr. Sethi, Mr. Berns, and Mr. Forjoe agreed that Mr. Forjoe should proceed.

68.    Three days later, on June 30, 2025, for the first time, Mr. Berns emailed Mr. Forjoe raising concerns about his job performance, even though no concerns were raised during the in-person meeting on June 27, 2025.  Mr. Berns email stated the following: "The marginal amount accomplished on the project by the deadline was ***once again insufficient*** and substantially well below the company's expectations.  Please continue on the replication project and focus on

---

[12] Delta hedging is an options trading strategy where traders buy or sell the underlying asset to create a delta-neutral position, meaning the portfolio's value is insensitive to small changes in the underlying asset's price.  By calculating the position's overall delta and then taking the opposite position in the underlying stock to offset it, traders can mitigate directional risk, though it requires constant adjustments and can incur transactional costs and other risks.

improving the quality and pace of the output by the end of July."

(emphasis added).

69.    Mr. Forjoe was understandably aghast.  At this point, no concerns had been raised about his job performance at Simplify, including on the replication project; to the contrary, he had only received positive feedback.  And prior to being assigned to the replication project—something Mr. Forjoe did not have experience with—Mr. Forjoe had been working with Pat Hennessy at Simplify, who frequently gave Mr. Forjoe glowing praise for his coding work.

70.    In response to David Berns' June 30, 2025, email, Mr. Forjoe responded diligently on July 1, 2025, disputing Mr. Berns' characterization that Mr. Forjoe's work had been insufficient previously—the inappropriate "once again" insertion in the email.  Mr. Forjoe's email stated the following:

> Thanks for your feedback.  I take pride in the integrity of my work product and therefore would like to understand your point of view better to make sure I can address any gaps fully.
>
> During our first formal check-in on Friday [(June 27, 2025)], I received positive feedback and no indication from you and Sid that my output was falling short of expectations.  I have never received any verbal or written indications that the pacing and quality of my work is below expectations.  To the contrary, prior reviews of my work product have been favorable.  As you can imagine, your email comes as a major surprise to me.
>
> After the positive review of the work I had done so far in our meeting on Friday, we agreed I would tackle the

29

intraday delta-hedging component next, with an estimated one- to two-week timeline.

I would appreciate it if you could share examples or data points that pinpoint where my work needs refinement - I welcome any actionable feedback. If easier, happy to do this over a call so I can ensure we are fully aligned on the replication project's objectives and timeline.

71. In response to Mr. Forjoe's email, Mr. Berns claimed he was surprised at Mr. Forjoe's interpretation of the June 27, 2025, meeting. On July 2, 2025, he wrote the following in an email to Mr. Forjoe:

It is surprising to me how you characterized this project and our meeting on Friday. I reserved formal judgment of your presentation until discussing the project afterwards with Sid to confirm that only about 1/4th of the deliverable was successfully delivered within the set deadline, a very large miss on expectations. That said, let's try to correct this out.

Please complete the current project both independently (without using Sid's time/resources) and in a timely manner (which I estimate to be about another 30 hours from Friday, since the project was expected to be completed in 40 hours and I estimate 1/4 was done by Friday).

Thank you. We will reevaluate at the end of the month.

72. Mr. Berns' email correspondence contains multiple red flags that reveal that Mr. Forjoe was being railroaded. *First*, when faced with the realities and challenges of the assigned project in-person in real time, Mr. Berns conveyed understanding and commended Mr. Forjoe for the work he performed. Thereafter,

30

Mr. Berns attempted to manufacture a written record of discontentment. *Second*, despite Simplify having had no success with replication throughout Mr. Forjoe's and Mr. Sethi's tenure up to that point, Mr. Berns speciously asked Mr. Forjoe to *complete* the project in an unrealistic timeline—in 30 hours, while withdrawing the resources of Mr. Sethi (who was the Head of QIS Structuring). This is less than a work week. If Simplify truly desired to "correct it out," Mr. Berns would not have withdrawn the resources of the individual most suitable to assist with the project. This is especially so because, when initially assigned, Mr. Forjoe was asked to collaborate with Mr. Sethi on the project and Simplify had already terminated Mr. Forjoe's long-time supervisor and teammate, Mr. McNeal.

73.     *Third*, Mr. Berns' email also states "[w]e will reevaluate at the end of the month." However, because this correspondence took place at the start of the month, and Mr. Berns himself indicated that he believed the project should take only 30 hours, *i.e.*, less than a week, reevaluation at the end of the month does not make sense. Rather, reevaluation within a few *days* would have been sensible. Why then would Mr. Berns want to reevaluate Mr. Forjoe at the end of the month? The truth is, he did not. Mr. Berns was signaling his true intent—to terminate Mr. Forjoe. The "end of the month" reference was a Freudian slip.

74.     Over the next few days, Mr. Forjoe exchanged multiple emails with Mr. Berns and Mr. Sethi about the progress he had been making. On July 3, 2025,

Mr. Forjoe emailed Mr. Berns requesting a call with him and Mr. Sethi.  In his email, Mr. Forjoe noted that he wanted to address the following things on the call: (1) his progress on the project; (2) the project's complexity; (3) how, if at all, he should collaborate with Mr. Sethi on the project moving forward; and (4) Mr. Berns' remark in his June 30, 2025, email that Mr. Forjoe's work was "once again insufficient."  The call was scheduled for July 8, 2025.  Unfortunately, during the call, the only topic that was covered was the progress Mr. Forjoe made on the replication project.  Mr. Sethi and Mr. Berns claimed they had to jump on another call before anything else could be addressed.

75.    After the July 8, 2025, call, Mr. Forjoe sent a follow-up email on that same day to both Mr. Sethi and Mr. Berns with a recap of their call.  Mr. Forjoe also sent a separate email directly to Mr. Berns only, explaining that they did not address the subject matter that Mr. Forjoe had asked to discuss.  In his email, Mr. Forjoe asked for Mr. Berns' availability to address these matters.  Mr. Berns, who seemingly did not want to contextualize his remarks, did not respond to Mr. Forjoe's request.  In fact, at no point during these communications did Mr. Berns ever provide a concrete example (or an example of any kind) of Mr. Forjoe's work being previously insufficient.

76.    Following his recent exchanges with Mr. Berns and Mr. Sethi, Mr. Forjoe became concerned that he would be wrongfully terminated, and that

32

Simplify would allege it was for Cause.  Mr. Forjoe retained counsel to protect himself.

77.    On July 17, 2025, Mr. Forjoe sent a progress email to Mr. Berns and Mr. Sethi.  It was not until July 25, 2025, that Mr. Berns responded with the following correspondence, lending credence to Mr. Forjoe's suspicions:

> I have received and reviewed your update to the replication project Powis.  As noted to you previously, it still falls far short of what the company reasonably expects from you as a Managing Director of the company, in terms of quality and timeliness.  Further, a simple component of the project like the one you completed above should take only a few hours to complete, not a full 7 business days. Please improve your performance markedly by the end of the month.

78.    Mr. Berns' July 25, 2025, email lacked specificity and made inapplicable comparisons to bolster the so-called "Cause" Simplify was manufacturing.  Specifically, Simplify did not really have any Managing Directors who did (or had ever done) what it hired Mr. Forjoe to do because it was wading into relatively new waters.  Therefore, the jejune comparison to the work of other Managing Directors—in either quality or timeliness—was inapposite.

79.    Undeterred, the next day on July 26, 2025, Mr. Forjoe responded with a lengthy email explaining what he had accomplished, what was outstanding, and all the complexities he faced completing the replication project, including the fact that the learning curve would add to the time required to complete the project

because it was Mr. Forjoe's first replication project. At no point did Mr. Sethi nor Mr. Berns ever dispute the authenticity of the challenges Mr. Forjoe flagged in his email. And how could they? It is well known that replicating strategies is extremely complex and the measure of success is a sliding scale. It bears repeating that *none* of Simplify's replication efforts over the near one-year period that Mr. Forjoe was employed were successful—*if* success is measured *only* as developing the precise model that renders a specific outcome. But, like those before him, including the institutions that specialize in replication work, Mr. Forjoe *did* make incredible progress with the tools and resources at his disposal.

80. Moreover, throughout the month of July 2025, Mr. Forjoe's correspondence reiterated his commitment and willingness to take on the task of completing the replication project. He never wavered from this commitment. During the last days in July, up to and including July 30, 2025, Mr. Forjoe sent emails to Mr. Berns and Mr. Sethi, documenting his progress on the replication project. On July 31, 2025, Mr. Forjoe and Mr. Sethi had a meeting to discuss Mr. Forjoe's progress. Consistent with his practice, Mr. Forjoe memorialized what was discussed at that meeting in an email on the same day. Later that same day, Mr. Sethi had a call with Mr. Forjoe where he (Mr. Sethi) explained that Mr. Berns asked him to write an email to Mr. Forjoe explaining that Mr. Forjoe's work did not meet the standards of a Managing Director. Mr. Sethi explained that he did not

agree with this assessment, and he did not want to write that email to Mr. Forjoe. Nevertheless, with his hand forced by his superior, the trap was complete—hook, line, and sinker.  Or so Simplify thought.

**Simplify's Second Breach of Contract**

81.    On August 1, 2025, Simplify terminated Mr. Forjoe for Cause.  A close examination of the definition of "Cause" in Mr. Forjoe's employment agreement proves that Simplify's justification is a sham and does not meet the definitional standard therein, which Simplify itself drafted.

82.    In relevant part, Simplify defined Cause as follows in Mr. Forjoe's employment contract:

> "Cause" means: (i) your repeated and willful failure to substantially perform your duties set forth in this Letter Agreement or any other duties or responsibilities agreed to in writing by you and the Company; . . . provided, however, prior to terminating your employment for Cause, the Company first must provide written notice to you within ten (10) days after the date on which the Company asserts an event constituting Cause has occurred, and then allow you thirty (30) days thereafter during which you may attempt to cure the matter giving rise to Cause unless such matter is not curable.

83.    The alleged conduct for which Simplify terminated Mr. Forjoe does not rise to the threshold of Cause, as defined in the contract.  *First*, Simplify cannot show that Mr. Forjoe "willfully" failed to perform his duties.  Throughout his time

35

on the replication project, Mr. Forjoe remained resolved, committed, and willing to perform his tasks. Nothing in the record can demonstrate otherwise.

84.    *Second*, to the extent Mr. Forjoe's work even marginally fell below the standard expected (which it did not), the challenges faced with the replication project can hardly be characterized as a "repeated" failure to perform his duties. The replication project was a single, extremely complex task, for which Mr. Forjoe was provided limited resources and an unrealistic timeline. Mr. Forjoe worked diligently, regularly updating Mr. Berns and Mr. Sethi of his progress and the challenges he faced. Difficulties with well-documented challenges on one project over the course of one month does not constitute "repeated" failure. Indeed, by the time Mr. Forjoe left Simplify, no one had completed a full replication, not even Mr. Sethi. What's more, the task was attempted by (and failed by) multiple people, including third-party experts. This proves the difficulty of the task, and the extremely low rate of success overall.

85.    *Third*, the factual record is devoid of Simplify providing formal notice to Mr. Forjoe of an "event constituting Cause." Simply claiming that a particular task fell below the standards of what was expected is not in compliance with this "Notice and Cure" provision. Because Mr. Forjoe was never formally put on notice, the Cure period was never triggered, and Mr. Forjoe's termination was procedurally improper.

86.    Because Mr. Forjoe's guaranteed contract only provided for termination for Cause, and because no Cause existed (as defined in the contract) to terminate Mr. Forjoe, Simplify breached its contract by wrongfully terminating Mr. Forjoe.

**FIRST CAUSE OF ACTION**
*Breach of Contract*

87.    Mr. Forjoe repeats and realleges each and every allegation contained in the preceding paragraphs as though set forth herein at length.

88.    Mr. Forjoe and Simplify entered into a valid three-year guaranteed employment contract on July 21, 2024.  The three-year period began August 6, 2024, and ended on August 6, 2027.  The compensation package included an annual base salary, sign-on bonus, annual bonus, and ancillary benefits for the entire period.  Under the terms of the contract, Simplify could only terminate Mr. Forjoe for Cause.  The Contract provided for additional pay for one year (both base salary and annual bonus) if Mr. Forjoe was terminated without Cause.

89.    Mr. Forjoe performed his obligations under the contract.  Simplify breached the contract in at least two ways: 1) failing to pay Mr. Forjoe his pro-rated bonus for the calendar year 2024 and 2) terminating Mr. Forjoe absent Cause.

37

90.     As a result of Simplify's breach of contract, Mr. Forjoe has been damaged in an amount no less than **$1,651,954.62**.[13]

## SECOND CAUSE OF ACTION
### *Wrongful Termination*

91.     Mr. Forjoe repeats and realleges each and every allegation contained in the preceding paragraphs as though set forth herein at length.

92.     Because Mr. Forjoe's contract was for a Guaranteed Term of three years and Simplify improperly terminated Mr. Forjoe absent Cause within that term, Simplify is liable to Mr. Forjoe for the tort of wrongful termination.

93.     Because the facts demonstrate that Simplify's actions were willful, malicious, and conducted with the specific intent to harm Mr. Forjoe, Simplify is liable to Mr. Forjoe for both compensatory damages and punitive damages in an amount no less than **$1,000,000**.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendant as follows:

A.     An award of compensatory damages in an amount no lower than $1,651,954.62;

---

[13] A court's assessment of mitigation of damages may slightly reduce this amount.

B.    An award of punitive damages in an amount no lower than $1,000,000;

C.    Prejudgment interest on all amounts due;

D.    An award of costs that Plaintiff has incurred in this action, including, but not limited to, Plaintiff's reasonable attorneys' fees and costs; and

E.    Such other and further relief as the Court may deem just and proper.

Dated: March 27, 2026
        New York, New York

Garland, Samuel & Loeb

By: */s/ Amanda Clark Palmer*
        Amanda Clark Palmer

        3151 Maple Drive, N.E.
        Atlanta, GA 30305
        Tel: (404) 262-2225

        amanda@gsllaw.com

        *Attorneys for Plaintiff Powis Forjoe*

ChaudhryLaw PLLC

By:    */s/ Priya Chaudhry*
        Priya Chaudhry
        *(Pro Hac Vice Pending)*
        Justin Mungai
        *(Pro Hac Vice Pending)*

        147 West 25th Street, 12th Floor
        New York, New York 10001
        Tel: (212) 785-5550

        priya@chaudhrylaw.com
        justin@chaudhrylaw.com

        *Attorneys for Plaintiff Powis Forjoe*